## BULLARD ET AL. v. CITY OF CISCO.

No. 10. Argued October 12, 1933.—Decided December 4, 1933.

*Mr. Dexter Hamilton* for petitioners.

*Mr. F. D. Wright,* with whom *Mr. J. J. Butts* was on the brief, for respondent.

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

This was an action at law brought in the federal court for the Northern District of Texas against the city of Cisco to recover on bonds and coupons issued by it. The plaintiffs were citizens of States other than Texas—three of New York and one of Ohio. The defendant city was a municipal corporation of Texas.

Of the pleadings it suffices now to say that the plaintiffs in their petition alleged that they were owners and holders of the bonds and coupons sued on, the former aggregating $14,000 and the latter $335,787.50; and that the defendant in its answer challenged the court's jurisdiction by alleging that the plaintiffs were not actual or beneficial owners of the bonds and coupons sued on but held them solely for purposes of collection on behalf of others who severally were the real owners, and none of

whom could sue in the federal court because their respective holdings were not in excess of $3,000.

The evidence at the trial, so far as now material, was to the following effect: The city of Cisco in 1902–1928 issued and sold, for considerations duly received, its bonds aggregating a large sum. Attached to the bonds were coupons to be paid from time to time. The bonds and coupons were all negotiable in form and payable to bearer. When this suit was begun the plaintiffs held $2,115,000 of the bonds, $14,000 thereof being past due and unpaid, and held past due and unpaid coupons aggregating $335,787.50. These past due bonds and coupons are the ones in suit and the plaintiffs produced them in evidence.

All of the bonds and coupons held by the plaintiffs were transferred to them by prior holders in conformity with, and for purposes defined in, a bondholders protective agreement of January 3, 1930. The prior holders were all citizens of States other than Texas; but the extent of their respective holdings so transferred was not shown by the evidence, save as it disclosed that the coupons sued on included $5,403.75 which, with the bonds to which they pertained, were received from George F. Averill, a citizen of Maine; $3,120 which, with the bonds to which they pertained, were received from the Title and Guaranty Trust Company, a corporate citizen of Ohio; and $5,590 which, with the bonds to which they pertained, were received from E. Sohier Welch, a citizen of Massachusetts.

The agreement of January 3, 1930, in general outline was much like the usual bondholders' protective agreement. The parties to it were, upon one hand, the plaintiffs, who were called the bondholders committee, and, on the other hand, all holders of bonds or coupons of the city who might thereafter deposit the same under the agreement in the manner provided.

There were introductory recitals that the city had failed to make payments of interest and principal in 1929; that it was desirable that holders of the bonds and coupons should " unite and organize for the protection of their interests "; that this protection could be " accomplished most effectively and with the least expense " through the committee if it were invested " with full power and authority in the premises "; and that the committee had consented to act. Provisions then followed for a depositary which was to act on behalf of the committee and under its direction; for the deposit of bonds and coupons with the depositary by their several holders, the deposit to be such as would transfer to the committee " the complete and absolute title "; and for the issue to each depositor of a certificate of deposit transferable only upon the books of the depositary. Other related provisions declared that the registered holder of any certificate of deposit should be deemed " for all purposes to be the absolute owner thereof and of the bonds and/or coupons therein referred to, and neither the depositary nor the committee shall be affected by any notice to the contrary "; that each depositor should be deemed, by reason of his deposit, to have assented to and agreed to be bound by all provisions of the agreement; that no depositor should have " any right to withdraw any bonds or coupons from deposit " or " to take any separate action " with respect to them after their deposit; and that deposited bonds and coupons " shall not be satisfied or discharged except if and as may be expressly declared or provided by the committee."

Two paragraphs, particularly defining the title and powers which the committee was to have, declared:

" Seventh: Every depositor, for himself and not for any other, hereby sells, assigns, transfers and delivers to the Committee, its successors and assigns, each and every bond and coupon deposited hereunder by him, and also all his right, title, interest, property and claim at law, or in

equity, by virtue of said bonds and coupons . . . and any and all his claims against the City or any receiver or receivers, or under any receivership of the City,[1] or any of its property, to the end that the Committee, as from time to time constituted, shall be vested with full legal title to all the bonds and coupons deposited hereunder, and to each and every claim based thereon. . . .

"Eighth: The Committee may, as the owner and holder of the deposited bonds and coupons, demand, collect and receive all moneys due or payable thereon and may take or cause to be taken, or participate in or settle, compromise or discontinue, any actions or proceedings for the collection of any of the bonds or coupons or the protection, enforcement or foreclosure of any legal or equitable lien securing or pertaining to same, including liens arising from the enforcement of taxes, levies, and assessments dedicated, levied or available for the service of the bonds,[2] or for the appointment of a receiver of the City or for any purpose whatsoever. The Committee may give such directions, execute such papers, and do such acts, as the Committee may consider wise or proper in order to preserve or enforce the rights or to advance or serve the interest of the depositors. . . ."

---

[1] The references to a possible receivership for the city and to the enforcement of taxes dedicated to the payment of the bonds have explanation in laws of Texas permitting receiverships for cities in certain situations, and in other laws of that State requiring the governing body of a city before issuing its bonds to "provide for the levy and collection of a tax annually sufficient to pay the annual interest and provide a sinking fund for the payment of such bonds." Constitution of Texas, Article II, § 5; Baldwin's Texas Statutes, arts. 826, 1024, 1241–1258; Vernon's Ann. Civ. St. (Tex.), arts. 826, 1024, 1241–1258; City of Cisco charter, article 11, §§ 7, 9, and article 13, § 4; Chapter 46, Texas Gen. Laws of 1929, p. 80 (repealed by Act of March 13, 1931, c. 26, Texas Gen. Laws of 1931, p. 33). And see *Bullard* v. *Cisco*, 48 F. (2d) 212.

[2] See note 1, *supra*.

Other paragraphs authorized the committee to purchase, acquire, sell or dispose of any property " which may be or become affected by any such lien, foreclosures, or taxes "; to borrow money for the purpose of making such purchases or acquisitions, discharging liens on property so purchased or acquired, or paying obligations and expenses of the committee, or for any other purpose of the agreement; and " to pledge all or any part of the bonds and coupons deposited hereunder as collateral security for the payment of any such loan or loans."

There were also provisions relating to " a plan or plans for the refinancing, readjustment, liquidation or settlement of all of the bonds and/or other obligations of said city." [3] By these provisions the committee was authorized to prepare or participate in preparing such a plan and to include therein arrangements (a) for the purchase or acquisition of any properties or securities, the purchase or acquisition of which, in the opinion of the committee, would aid in advancing the interests of the certificate holders, and (b) for the " sale, exchange or disposition " of the " whole or any pro rata part of the deposited bonds and coupons." The plan was to be submitted to the holders of certificates of deposit, and each holder was to be taken as assenting thereto unless within thirty days he dissented in writing. If two thirds assented the committee was to be at liberty either to make the plan operative or to abandon it and submit another. If any plan from which there was a dissent was made operative the committee was required to return to each dissenting certificate holder " The bonds and coupons represented by his certificate," upon the surrender of the certificate and the payment by him of " an amount to be fixed by the committee "—which amount evidently was to be fixed

---

[3] A law of Texas particularly authorizes the governing body of a city to " compromise and fund " its indebtedness and to issue new bonds on the basis of the compromise. Baldwin's Texas Statutes, arts. 828–834; Vernon's Ann. Civ. St. (Tex.) arts. 828–834.

on the basis prescribed in another provision soon to be mentioned.

The agreement further declared that the deposited bonds and coupons and all property purchased or acquired by the committee should be charged with the payment of the compensation, expenses, etc., of the committee; that any member of the committee might become " pecuniarily interested " in any property or matters which might be subject to the agreement or to any plan of readjustment; and that the committee should have authority to construe the agreement, and its construction thereof, made in good faith, should be conclusive and bind the holders of certificates of deposit.

It was also provided that the agreement should not remain in force beyond the period of five years from its date, unless extended by the committee with the consent of the holders of certificates representing a majority in amount of the deposited bonds and coupons; and that the committee, if considering it expedient, might terminate the agreement at any time by a vote of two thirds of its members and giving notice thereof to the certificate holders.

Upon the termination of the agreement the securities, cash and property held thereunder by the committee were to be distributed by the committee among the certificate holders according to the amount of deposited bonds and coupons represented by their respective certificates, but subject to and upon the condition that each certificate holder should pay his share, as fixed by the committee, of the compensation and expenses of the committee, its counsel, agents and depositary, and of all indebtedness, obligations and liabilities incurred by the committee.

From the evidence here outlined the District Court concluded (a) that under the agreement the committee (the plaintiffs) received the bonds and coupons merely as a collection agency and had no real ownership of them; (b) that of the owners who deposited their bonds and

coupons with the committee only three were shown to have severally deposited more than $3,000 of those sued on; and (c) that the particular bonds and coupons received from these three depositors were not in the evidence identified or segregated from the others. The court gave effect to its conclusions by sustaining the challenge to its jurisdiction and dismissing the suit without prejudice.

On an appeal by the plaintiffs, the Circuit Court of Appeals held that under the agreement the committee received and held the legal title to the bonds and coupons simply for purposes of collection and had no beneficial ownership; that the depositing holders remained the beneficial owners; that as to such of the bonds and coupons in suit as could not have been sued on by the beneficial owners, because their respective holdings were not in excess of $3,000, the suit was not within the jurisdiction of the District Court and should have been dismissed; that as to such of the bonds and coupons in suit as could have been sued on by the beneficial owners, because their respective holdings were in excess of $3,000, the suit " was not kept from being one within the court's jurisdiction by the fact that appellants [the committee] were vested with the legal title to those instruments simply for the purpose of collection "; and that, as the coupons in suit included three lots—each of more than $3,000 and apparently susceptible of identification and segregation—which were received from depositing holders who could have sued thereon in the federal court, it was error to dismiss the suit in its entirety for want of jurisdiction without distinctly according to the plaintiffs an opportunity by evidence to identify and segregate the coupons received in the lots of more than $3,000.

Thus, the Court of Appeals, while in the main approving the District Court's decision of the jurisdictional issue, pronounced its judgment of dismissal erroneous as

to a minor part of the coupons sued on. For that error the judgment of the District Court was reversed with a direction for further proceedings conforming to the rulings of the Court of Appeals. 62 F. (2d) 313.

The plaintiffs, insisting that the suit in its entirety was within the District Court's jurisdiction, petitioned for certiorari, which this Court granted.

Under § 41 (1), Title 28, U.S.C.,[4] two things were essential to the jurisdiction of the District Court—one, that the suit be between citizens of different States, and the other that the sum or value in controversy, exclusive of interest and costs, be in excess of $3,000. It was shown and not questioned that the parties—the plaintiffs on the one hand and the defendant on the other—were citizens of different States. The suit was on bonds amounting to $14,000 and coupons amounting to $335,787.50—all payable to bearer, made by the defendant corporation and held by the plaintiffs—and recovery was sought of the full amount of these bonds and coupons. Thus both jurisdictional requisites were apparently present.

But it is urged that a part of that which made for such apparent jurisdiction was not real but colorable only, in that the plaintiffs had no actual ownership of the bonds and coupons sued on, but held them solely for purposes of collection on behalf of others who severally were the

---

[4] Sec. 41. The district courts shall have original jurisdiction as follows:

(1) First. Of all suits of a civil nature, at common law or in equity, . . . where the matter in controversy exceeds, exclusive of interest and costs, the sum or value of $3,000, and . . . is between citizens of different States, . . . No district court shall have cognizance of any suit (except upon foreign bills of exchange) to recover upon any promissory notes or other chose in action in favor of any assignee, or of any subsequent holder if such instrument be payable to bearer and be not made by any corporation, unless such suit might have been prosecuted in such court to recover upon said note or other chose in action if no assignment had been made.

actual owners but unable to sue in the federal court since their respective claims were too small to satisfy the jurisdictional requirement. If this were all true the conclusion would follow that the suit was not properly within the jurisdiction of the District Court and should have been dismissed under § 80, Title 28, U.S.C.[5]

On the other hand, if the transfers whereby the plaintiffs came to hold the bonds and coupons were not merely colorable or simply for purposes of collection, but were real and intended to invest the plaintiffs with the full title, even though in trust for purposes of which the transferrers ultimately would be the chief beneficiaries, it is quite plain that the plaintiffs could sue in the federal court notwithstanding the several transferrers, by reason of their small holdings, may have been unable to do so. With one accord prior decisions of this Court show that the right of a transferee of corporate bonds and coupons, payable to bearer, to sue in a federal court, notwithstanding a disability of his transferrers in that regard, turns on

---

[5] Sec. 80. " If in any suit commenced in a district court, or removed from a State court to a district court of the United States, it shall appear to the satisfaction of the said district court, at any time after such suit has been brought or removed thereto, that such suit does not really and substantially involve a dispute or controversy properly within the jurisdiction of said district court, or that the parties to said suit have been improperly or collusively made or joined, either as plaintiffs or defendants, for the purpose of creating a case cognizable or removable under this chapter, the said district court shall proceed no further therein, but shall dismiss the suit or remand it to the court from which it was removed, as justice may require, and shall make such order as to costs as shall be just."

As examples of the enforcement of this provision, see *Williams* v. *Nottawa,* 104 U.S. 209; *Bernards Township* v. *Stebbins,* 109 U.S. 341, 354–356; *Farmington* v. *Pillsbury,* 114 U.S. 138, 143–146; *Lake County* v. *Dudley,* 173 U.S. 243, 252–254; *Waite* v. *Santa Cruz,* 184 U.S. 302, 325–329; *Woodside* v. *Beckham,* 216 U.S. 117. And see *Crawford* v. *Neal,* 144 U.S. 585, 593; *Black & White Taxicab Co.* v. *Brown & Yellow Taxicab Co.,* 276 U.S. 518, 524.

the nature of the transfer—whether it be real or only a colorable device to enable the transferrers, through the favor and name of the transferee, to invoke a federal jurisdiction which they could not invoke in their own right.[6]

We are of opinion that the purpose of the agreement of January 3, 1930, was not to create a mere collection agency, nor to set up a merely colorable device for circumventing restrictions on federal jurisdiction, but to put the bonds and coupons—the owners of which were numerous and widely scattered—into an express trust—to be managed and administered by four trustees—for the purpose of conserving, salvaging and adjusting the investment—the municipal debtor having become financially embarrassed. The depositing owners, or succeeding certificate holders, were to be the *cestuis que trustent* or beneficiaries. The plaintiffs were to be the trustees. Although not called trustees in the agreement, they necessarily had that status by reason of the rights, powers and duties expressly assigned to them. There was a distinct declaration that they should have full title to the deposited bonds and coupons, and this was fortified by other provisions defining the control and power of disposal which the trustees were to have over them.

Counsel for the defendant inquire—If the committee were to be the legal owners of the bonds and coupons, why were they authorized to borrow money and pledge the bonds and coupons for its repayment, as also to do other things which legal owners would be free to do without special authorization. The answer is obvious. The title and authority confided to the persons constituting the committee were confided to them as trustees, and not in their personal right, and there was need for carefully and fully defining the authority; for trustees are not permitted to go beyond such as is given expressly or by necessary implication.

---

[6] See cases cited in note 5.

To summarize, we think it apparent from the agreement as a whole that resort to litigation was not the principal thing in mind when it was being made, and that what was intended was to invest the trustees with full title and such discretionary powers as might enable them to effect a helpful adjustment of the situation through refinancing, composition, exchange of securities and other means, including litigation if needed.

As the transfers under which the plaintiffs held the bonds and coupons were made to them as trustees, were real and not simply for purposes of collection, and invested them with the full title, they were entitled, by reason of their citizenship and of the amount involved, to bring the suit in the federal court. The beneficiaries were not necessary parties and their citizenship was immaterial.[7]

The judgments of both courts below must be reversed and the cause remanded to the District Court for further proceedings in conformity with this opinion.

*Judgments reversed.*

---

[7] *Dodge* v. *Tulleys*, 144 U.S. 451, 455–456; *Coal Co.* v. *Blatchford*, 11 Wall. 172, 175; *Knapp* v. *Railroad Co.*, 20 Wall. 117, 123–124.