Patrice K. REHM and Robert L. Meuser, Plaintiffs

v.

The BALTIMORE STORAGE CO. and Mayflower Transit, LLC, Defendants.

No. CIV.A. 303CV00037.

United States District Court, W.D. Virginia, Charlottesville Division.

Jan. 29, 2004.

John T. Husk, Seaton & Husk, L.P., Vienna, VA, for Defendants.

## MEMORANDUM OPINION

MICHAEL, Senior District Judge.

The plaintiffs in this action seek various forms of relief for damage to their personal and real property incurred during a move from Washington, D.C. to Charlottesville, Virginia. The defendants responded by filing a motion to stay pending resolution of a declaratory judgment action filed in a District of Columbia circuit court. Asserting that the plaintiffs have failed to state a claim upon which relief can be granted, the defendants also filed a motion to dismiss. The magistrate judge recommended that this court deny the defendants' motion to stay, grant the defendants' motion to dismiss on various counts, and deny the defendants' motion to dismiss on other counts. After a thorough examination of both the defendants' and the plaintiffs' objections to the magistrate judge's report and recommendation, the supporting memoranda, the applicable law, and the report and recommendation, this court adopts in part the analysis and findings of the magistrate judge. The court accepts his recommendation to deny the defendants' motion to stay and accepts his recommendations concerning the defendants' motion to dismiss, with the exception of the recommendation concerning dismissal of the carrier's agent.

## I. FACTS

For the most part, the facts of the case are undisputed. The plaintiffs Patrice Rehm and Robert Meuser moved to Charlottesville in July 2002 after Ms. Rehm was hired by the University of Virginia. The couple contracted with Mayflower Transit, LLC ("Mayflower") and its agent, Baltimore Storage Co., to transport their goods from Washington, D.C.

Patrice K. Rehm, Charlottesville, VA, Pro se.

Robert L. Meuser, Charlottesville, VA, Pro se.

According to the complaint, the terms of the agreement between the plaintiffs and Baltimore Storage specified that plaintiffs' goods were to be transported from three locations in the District of Columbia—their home, Ms. Rehm's office, and rented storage bins—to three corresponding locations in Charlottesville. The order for service included specific charges for these additional points of origination, stops, and destinations. The plaintiffs designated the destination of their goods by labeling each box and by informing the moving crew about the labels.

Although a separate packing crew was to be provided, it was not available on the actual day of the move. According to the complaint, this crew had been reassigned to another job relocating a retail clothing store in Northern Virginia. As a result, the moving crew conducted the packing. The crew finished the loading on July 19, 2000. At this point, Mr. Meuser departed for California on a business trip and left Ms. Rehm in Charlottesville to accept delivery of the household goods.

The delivery of the goods began the next day, July 20, 2000. Throughout the unloading, Ms. Rehm observed what she perceived to be haste and sloppiness in the work of the moving crew. She also witnessed damage to her goods and to her residence. Several boxes labeled for delivery to the Charlottesville storage bins were not delivered to their designated location.

When the moving crew was ready to depart, Ms. Rehm was approached to sign the bill of lading. She initially refused to sign the bill on the basis of damage to her goods and to her home, as well as the misdelivery of certain goods. According to the plaintiffs, the crew chief then became belligerent and hostile and refused to depart until the bill was signed. The plaintiffs further allege that the three other adult men on the moving crew appeared incensed due to her refusal to sign and that she perceived them to be threatening and intimidating. The court notes that, at this point in the course of events, the hour was late, the house remote, and Ms. Rehm alone.

Ms. Rehm then telephoned Mr. Meuser. Through this conversation, the plaintiffs secured the crew chief's verbal agreement to acknowledge the damage on the bill of lading, and Ms. Rehm agreed to sign. After Ms. Rehm hung up the telephone, the crew chief reneged and refused to note the objections on the bill of lading and again assumed his belligerent posture. The plaintiffs allege that Ms. Rehm then agreed to sign as a result of this intimidation. Ms. Rehm was permitted to make several notations on the Household Goods Descriptive Inventory, but not directly on the bill of lading.

The next day, on July 21, 2000, the plaintiffs contacted Baltimore Storage regarding the misdelivered goods. Baltimore Storage agreed to return to deliver the goods to the correct destinations, a delivery effectuated on July 25, 2000. Although Mayflower did not assess additional charges, Baltimore Storage listed the work completed on July 25 under a separate order number and requested that the plaintiffs sign a second shipping document. On July 25, the plaintiffs also received a claim form labeled "Mayflower Transit Form."

Although the plaintiffs claim that they were not informed of the need to return the form by a particular date, they acknowledge that the original bill of lading contained a provision stating that any claim for loss or damage against Mayflower must be "filed in writing within nine (9) months after delivery." The plaintiffs mailed this form to the Baltimore Storage on April 20, 2001. The form was received by Baltimore Storage four days later, on

April 24, 2001. Baltimore Storage denied the claim based upon its understanding that the form was received outside the nine-month period.

Since the move, the plaintiffs have neither repaired the damage to their goods or to their home nor replaced the damaged goods. Furthermore, the plaintiffs allege that, notwithstanding Mayflower's actual notice of the claim, no effort has been made to inspect the damage.

## II. PROCEDURAL POSTURE

On April 21, 2003, the plaintiffs informed Mayflower by letter that, absent favorable resolution of the claim, they would initiate legal action. Without responding to the plaintiffs' letter, Mayflower instituted its own suit on April 23, 2003 in the Circuit Court for the District of Columbia seeking a declaratory judgment concerning the applicability of the Carmack Amendment to the transaction and a determination that the plaintiffs' claim fell outside the time period permitted by the Amendment. On April 28, 2003, the plaintiffs instituted this action in this court asserting various federal and state law claims.

The plaintiffs allege six counts in their complaint. First, the plaintiffs claim that their claim was wrongfully denied as untimely. Second, they claim that Mayflower failed to provide the minimum time period for claims established by the Carmack Amendment. Third, the plaintiffs allege that Mayflower engaged in fraudulent, negligent, grossly negligent, and wanton conduct in the claims process. Fourth, the plaintiffs allege that the negligence, gross negligence, and recklessness of the moving crew caused damage to their residence. Fifth, citing deception and fraud in connection with a consumer transaction, the plaintiffs claim that Mayflower violated Virginia consumer protection law. Sixth, the plaintiffs have alleged that Mayflower

discriminated against them in favor of other shippers in violation of federal statute.

In response, on June 27, 2003, the defendants filed a motion to stay and, in the alternative, a motion to dismiss for failure to state a claim. In the motion to stay, the defendants ask this court to await the decision of the District of Columbia court. The defendants' motion to dismiss can be divided into three positions. First, the defendants claim that the plaintiffs' failure to file a timely claim bars their suit. Second, the defendants contend that the plaintiffs' state law claims are preempted by the Carmack Amendment. Third, the defendants ask this court to dismiss Baltimore Storage as a party due to the fact that it is a disclosed agent of Mayflower and that only Mayflower can be held liable under the Carmack Amendment in this circumstance.

On July 1, 2003, the matter was referred to Magistrate Judge Crigler for his report and recommendation, which he filed on October 14, 2003 ("Report and Recommendation"). In the Report and Recommendation, he recommended that the defendants' motion to stay be denied. He then recommended that the defendants' motion to dismiss be granted in part and denied in part. Both the plaintiffs and the defendants have filed timely objections to the Report and Recommendation.

## III. STANDARD OF REVIEW

According to § 636(b)(1)(C), this court "shall make a de novo determination of those portions of the report ... to which the objection is made." 28 U.S.C. § 636(b)(1)(C) (2000). First, with respect to the motion to stay, "[t]he decision of whether to defer proceedings because of parallel state litigation is generally committed to the discretion of the district court." *Kruse v. Snowshoe Co.,* 715 F.2d 120, 122 (4th Cir.1983); *accord Allstate*

*Ins. Co. v. Hechinger Co.,* 982 F.Supp. 1169, 1175 (E.D.Va.1997).

Second, to decide a motion to dismiss under Rule 12(b)(6), the court must determine "whether the complaint under the facts alleged and under any facts that could be provided in support of the complaint, is legally sufficient." *E. Shore Mkts., Inc. v. J.D. Assocs.,* 213 F.3d 175, 180 (4th Cir.2000). "A court, when ruling on a 12(b)(6) motion to dismiss, can consider any documents attached to the complaint or incorporated in the complaint by reference." *Hammonds v. Builders First Source–Atl. Group, Inc.,* 2002 WL 535071, at *2 (W.D.Va. Mar. 28, 2002). The court must "assume the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations ... [but] need not accept the legal conclusions drawn from the facts ... [or] accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc.,* 213 F.3d at 180 (citations omitted). "A motion to dismiss for failure to state a claim for relief should not be granted 'unless it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Id.* (quoting *G.E. Inv. Private Placement Partners II v. Parker,* 247 F.3d 543, 548 (4th Cir.2001)).

## IV. DISCUSSION

Each of the parties has filed objections to the Report and Recommendation. As an initial matter, however, neither party contests the magistrate judge's recommendation to deny the motion to stay, and this court sees little reason to disturb that determination. Also, the plaintiffs ostensibly assert several objections to the findings of fact. In actuality, the plaintiffs merely contend that the magistrate judge did not transpose every allegation from the complaint to his own recitation of the facts. Because many of these facts were conveyed in some form or another in the Report and Recommendation and because they generally are not pertinent to the court's discussion, the court dismisses the objections to the factual findings as moot. Moving then to the motion to dismiss, the court will address first the plaintiffs' objections and second the defendants' objections.

### A. Timely Filed

Curiously, the plaintiffs' first objection contends that the magistrate judge did not go *far enough* in permitting their claim to proceed. The magistrate judge recommended that this court deny the defendants' motion to dismiss the plaintiffs' first cause of action based upon the plaintiffs' allegations that delivery of the goods was not completed until July 25, 2000 and upon their allegations that Ms. Rehm signed the bill of lading under duress. Thus, the magistrate judge reasoned that the plaintiffs have advanced allegations that would support their claim that receipt of the form on April 24, 2001 constituted receipt within the claim period. Because this recommendation rendered the plaintiffs' objections moot, the court declines to address the plaintiffs' arguments at this stage of the proceedings. The magistrate judge concluded that at least two bases support the plaintiffs' claim and no doubt will address the plaintiffs' alternative theories concerning the first cause of action at a later stage of the pretrial process. The court expresses no opinion as to the validity of the plaintiffs' theories concerning this cause of action.

### B. Preemption of Cause of Action Relating to Claims Process Conduct

The plaintiffs also object to the magistrate judge's finding that the Carmack Amendment preempts their cause of action relating to the conduct of the defendants during the claims process. In *Shao v.*

*Link Cargo Ltd.*, the Court of Appeals for the Fourth Circuit announced the test for federal preemption in the context of the Carmack Amendment. 986 F.2d 700, 704 (4th Cir.1993).

> Federal law preempts state and common law when Congress expressly provides that the federal law supplants state authority in a particular field, or when its intent to do so may be inferred from a pervasive system of regulation which does not leave a sufficient vacancy within which any state can act. Preemption may also be inferred where state legislation would impede the purposes and objectives of legislation enacted by Congress. . . .
>
> [T]he Carmack Amendment was intended by Congress to create a national uniform policy regarding the liability of carriers under a bill of lading for goods lost or damaged in shipment. Allowing a shipper to bring common law breach of contract or negligence claims against a carrier for such loss or damage conflicts with this policy.

*Id.* at 704, 706.

 Although the court of appeals did not address causes of action related to the claims process specifically, there can be little doubt that the reasoning of *Shao* would not permit the maintenance of the plaintiffs' theory. Quoting the Supreme Court, the court noted that "[a]lmost every detail of the subject [of the liability of a carrier under a bill of lading] is covered so completely [by the Carmack Amendment] that there can be no rational doubt but that Congress intended to take possession of the subject and supersede all state regulation with reference to it." *Id.* at 704 (alteration in original) (quoting *Adams Express Co. v. Croninger,* 226 U.S. 491, 505–06, 33 S.Ct. 148, 57 L.Ed. 314 (1913)). Evidence of congressional intent to supersede state regulation of the claims process can be located in two sources. First,

§ 14706 provides a minimum time for filing claims. 49 U.S.C. § 14706 (West 2000). Second, regulatory interpretation of this statutory provision establishes a labyrinth of regulations concerning the claims process and the obligations of carriers in this regard. 49 C.F.R. § 1005.1–1005.7 (2002). In addition, state regulation of the claims process would no doubt frustrate the purpose of the act as defined by the court of appeals—to create a national uniform policy regarding the liability of carriers. Therefore, the court holds that the plaintiffs' claims relating to tortious conduct in the claims process are preempted by the Carmack Amendment. *Accord Rini v. United Van Lines, Inc.,* 104 F.3d 502, 505–06 (1st Cir.1997); *Gordon v. United Van Lines, Inc.,* 130 F.3d 282, 289–90 (7th Cir.1997).

This conclusion obtains notwithstanding the plaintiffs' characterization of the conduct as tortious. Without a doubt, much of the difficulty in this issue is introduced by the close relationship between a tort cause of action and a contract cause of action when the alleged tortious conduct relates to breach of contractual duties. As the magistrate judge noted, it is difficult, if not impossible, to separate the two. In fact, in terms of its third cause of action for fraud, the duty that the plaintiffs allege was breached had its basis in the contract itself. The plaintiffs alleged that "Defendants owed a duty to Plaintiffs by contract [and] under the common law of common carriage . . . ." (Pl. Obj. to Oct. 14, 2003 R & R at 13.) It is clear that if this claim is characterized as a breach-of-contract claim—a characterization not far off the mark—the cause of action is preempted. If, as the plaintiffs reason, the claim is one sounding in tort, it is preempted because the duty between the plaintiffs and the defendants has its genesis and its basis in the contract and in the legal relationship between shipper and carrier. "It is [the

duty arising from the commitment of goods to the custody of the carrier] which Congress undertook to make uniform and regulate, preempting any state regulation of that duty." *Shao*, 986 F.2d at 705.

## C. Preemption of Virginia Consumer Protection Law Claim

Next, the plaintiffs protest the magistrate judge's finding that the Carmack Amendment preempts their cause of action asserted pursuant to Virginia consumer protection law. In their fifth cause of action, the plaintiffs allege deceptive trade practices "in connection with Plaintiffs' claims for loss or damage under the Bill of Lading." Although positing a different ground for recovery, plaintiffs predicate this cause of action upon misconduct in the claims process. As noted above, in *Shao*, the court of appeals held that the Carmack Amendment has broad preemptive effect. "Allowing a shipper to bring common law breach of contract or negligence claims against a carrier for such loss or damage conflicts with this policy." *Shao*, 986 F.2d at 706. Furthermore, the court has already concluded that the cause of action alleging tortious conduct in the claims process is preempted. Other than the statutory basis of the right and remedy, the court cannot discern any difference between this cause of action and the one discussed above.

█ Because Congress intended "to create a national scheme of carrier liability for goods damaged or lost during interstate shipment under a valid bill of lading," the Carmack Amendment preempts state regulation of the claims process. The Carmack Amendment regulates interstate contracts for carriage. To the extent Virginia law prohibiting fraud in consumer transactions would purport to regulate the same, it would plainly interfere with congressional intent " 'to adopt a uniform rule and relieve such contracts from the diverse regulation to which they had been theretofore subject.' " *Id.* at 704 (quoting *Adams Express Co. v. Croninger*, 226 U.S. 491, 505–06, 33 S.Ct. 148, 57 L.Ed. 314 (1913)). Therefore, the plaintiffs' fifth cause of action is also preempted.

## D. Discrimination Claim

In the Report and Recommendation, the magistrate judge recommended that this court dismiss the plaintiffs' claim that the defendants discriminated against them in favor of other shippers in violation of federal law. The plaintiffs object to this conclusion on the ground that the decision of the Court of Appeals for the Fourth Circuit in *Hubbard v. Allied Van Lines*, 540 F.2d 1224 (4th Cir.1976), supports their cause of action.

In *Hubbard*, the plaintiffs were shippers of household furniture and other personal property who contracted with a common carrier. *Id.* at 1225. The plaintiffs in that case alleged that the carrier had failed to deliver the goods in a timely fashion and that several goods had been lost or damaged en route. *Id.* The plaintiffs alleged that the delay occurred because "the defendant used its equipment to haul the goods of other unknown persons instead of plaintiffs' goods, 'without any valid reason therefor,' and that defendant thereby gave an undue and unreasonable preference to such other persons." *Id.* The carrier visited this injury upon the plaintiffs, it was alleged, in a reckless, willful, and wanton manner, in callous disregard of their rights. *Id.* Finally, the plaintiffs alleged that this breach of the duty of nondiscrimination caused them to suffer extreme mental anguish and distress. *Id.* The Court of Appeals for the Fourth Circuit held that a private right of action existed for breach of the statutory duty of nondiscrimination and that the plaintiffs' allegations, if taken as true, supported the maintenance of that cause of action and entitled them to intro-

duce proof supporting the recovery of damages for the breach, including punitive damages. *Id.*

■ Despite some similarities between the two cases, an examination of the *Hubbard* court's reasoning leads to the conclusion that the plaintiffs' cause of action must be dismissed. The court's decision in *Hubbard* rested primarily on former § 316, a provision which has since been recodified in various portions of title 49. Section 10741, for example, prohibits discrimination by rail carriers. As the magistrate judge duly noted, however, the only provision applicable to motor carriers that remotely resembles the language upon which the court of appeals relied relates to tariff violations. *See* § 14903. That section creates a civil penalty for undercharging and overcharging for transportation of property "at a rate different than the rate in effect [pursuant to a published tariff]." *Id.* In the event that the carrier over- or undercharges, it is liable to the United States. In this case, the plaintiffs have not alleged that the carrier did not adhere to its published tariff rates. Therefore, the plaintiffs' sixth cause of action is dismissed.

### E. Real Property Damage

The defendants object to the Report and Recommendation on two grounds. First, the defendants contend that the magistrate judge too narrowly defined the scope of Carmack preemption when he permitted the plaintiffs' cause of action relating to real property damage to proceed. Second, the defendants contend that, even if the claim is not preempted, the magistrate judge erred when he did not dismiss the disclosed agent of Mayflower, Baltimore Storage.

#### 1. Preemption of Real Property Damage Cause of Action

■ After much consideration of the matter, the court accepts the magistrate judge's recommendation to permit the cause of action relating to real property damage to proceed. The text of the act and its purpose suggest no congressional intent to regulate damage to residences incurred during interstate shipment of goods. Absent congressional directive, state regulation of this area is therefore permissible.

Although Congress has undertaken to regulate nearly all aspects of the legal relationship between common carrier and shipper, there is no evidence that Congress has sought to extend the reach of the Carmack Amendment to real property damage incidental to the transportation service. There is no explicit textual reference regulating damage to residences by motor carriers. Nor can the court locate any implicit intent to regulate (or not to regulate) this area of carrier conduct. Section 14706 defines the general liability of motor carriers and freight forwarders. That statutory provision imposes a duty to issue a bill of lading "for property [a carrier] receives for transportation" and liability for "the actual loss or injury to [this] property." On its face, then, the statute refers to personalty, and not to real property. The regulations cited above also are limited to property "transported or accepted for transportation in interstate or foreign commerce." 49 C.F.R. § 1005.1. Furthermore, the regulations in part 1005 make reference to damage to "baggage," "cargo," "package," and "shipment" but do not contain any mention of claims relating to residential damage. It is difficult therefore to glean any textual reference supporting congressional intent to supplant state law concerning damage to real property.

The court rejects the defendants' argument that the statute itself supports the conclusion that this claim is preempted. The defendants reason that Congress intended to preempt state law in this area

because § 14501 prohibits the enactment or enforcement of any law "related to a price, route, or service of any motor carrier ... with respect to the transportation of property" and because transportation is defined in § 13102(19)(B) as "services related to [the movement of property], including arranging for, receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, packing, unpacking, an interchange of passengers and property." However, on its face, § 14501 provides that the preemptive directive "does not apply to the transportation of household goods." § 14501(2)(B). "Household goods" is defined as "personal effects and property used or to be used in a dwelling ...." § 13102(10). The court has not been supplied with an argument that this exclusion does not apply here or that another provision of the statute preempts this state cause of action. Moreover, it is overly simplistic to state than any event that merely touches upon interstate transportation of goods is covered by the Carmack Amendment. *See Shao*, 986 F.2d at 705 (reasoning that Carmack Amendment would not preempt a state or common law claim against a third-party torfeasor that may have caused damage to goods in carrier's custody).

The lack of statutory reference in federal law regulating this legal relationship demonstrates that it was Congress's intent to regulate the terms of the bailment. The duty of a carrier not to cause damage to a residence upon unloading is another matter. It does not arise from the legal relationship specific to carrier and shipper but from the relationship general to two individuals. While it is true that delivery is a service offered by an interstate carrier, it is conceivable that congressional silence indicates a desire to permit contractual regulation of this duty or, in the absence of such private ordering, to permit the common law of negligence to operate as a default rule.

The purpose of the act does not seem to support the inference that Congress intended to preempt state common law of negligence either. "[T]he Carmack Amendment was intended by Congress to create a national uniform policy regarding the liability of carriers under a bill of lading *for goods lost or damaged in shipment." Shao*, 986 F.2d at 706 (emphasis added). The Carmack Amendment regulates the terms of the bill of lading, a document which governs the legal relationship between carrier and shipper with respect to the goods to be transported. The distinct nature of the common law dealing with common carriers, and the federal statutory law that governs their interstate operation, arises from the commitment of goods to the possession of another. *See id.* at 705 (distinguishing "common law remedies for goods damaged due to a breach of duty by one not responsible for their shipment" from cases "rest[ing] on the alleged breach of duty arising from the commitment of goods to the custody of the [carrier] for shipment").[1]

---

1. The cases cited by the defendants do not support a different conclusion. Each of them relates to a cause of action concerning the loss of goods committed to the care of a common carrier or the contractual relationship between carrier and shipper. *See Gordon v. United Van Lines, Inc.*, 130 F.3d 282, 288 (7th Cir.1997) (concluding that state law claims concerning damage to goods lost in transit, fraud in the formation of the contract, and conduct in the claims process preempted); *Hopper Furs, Inc. v. Emery Air Freight*

*Corp.*, 749 F.2d 1261, 1264 (8th Cir.1984) (holding that claim for negligent loss of goods controlled by contract); *Underwriters at Lloyds of London v. N. Am. Van Lines*, 890 F.2d 1112, 1121 (10th Cir.1989) (holding that cause of action for negligent loss of goods shipped pursuant to a bill of lading superseded); *Smith v. UPS*, 296 F.3d 1244, 1247–48 (11th Cir.2002) (concluding that claims based on loss or misdelivery of packages preempted).

Because it is not clear that the state common law of negligence "would impede the purposes and objectives of legislation enacted by Congress," *Shao*, 986 F.2d at 704, the court will permit the plaintiffs' fourth cause of action to proceed.

*2. Dismissal of Disclosed Agent*

█ Notwithstanding the court's view that Congress did not intend to preempt state law related to real property damage, the court disagrees with the magistrate judge's recommendation to retain Baltimore Storage as a party to this suit. The broader language of the statutory provision assigning responsibility to the principal supports the conclusion that, while the agent's damage to the residence is not regulated by the act, the principal is liable for damage incidental to the transportation service, as well as for conduct ratified by the principal. Section 13907 provides that

> [e]ach motor carrier providing transportation of household goods shall be responsible for all acts or omissions of any of its agents which relate to the performance of household goods transportation services (including accessorial or terminal services) and which are within the actual or apparent authority of the agent from the carrier or which are ratified by the carrier.

§ 13907(a). This provision has been interpreted to permit the dismissal of the disclosed agent from a suit brought by the shipper when his actions are within the actual or apparent authority of the principal. *Parramore v. Tru–Pak Moving Sys., Inc.*, 286 F.Supp.2d 643, 649 (M.D.N.C. 2003). Here, there can be little doubt that the damage was an omission related to the performance of household goods transportation services and that Baltimore Storage was authorized to transport and to unload the goods as part of its arrangement with Mayflower.

Although it may seem odd to utter in one breath the court's understanding that damage to real property is not regulated by the Carmack Amendment and in the next breath to conclude that the liability relating to real property damage is the liability of the principal and not the agent, the court believes these two findings can be reconciled. First, the breadth of the provision governing principal liability for the acts of its agent is expansive and includes "*all* acts or omissions ... which *relate to* the performance of household good transportation *services.*" § 13907(a) (emphasis added). As explained above, the text of the act that defines the liability of the carrier is not nearly so sweeping. Second, even if Congress did not intend to regulate the substantive liability of carriers, it could have intended to apportion liability between principal and agent whether the source of the liability is federal or state law. Section 13907 reflects an intent by Congress to regulate the duty between principal and agent and therefore has little bearing on the relationship between carrier and shipper.

The defendants' objection to the magistrate judge's recommendation to retain Baltimore Storage as a party defendant is sustained, and the court will grant the motion to dismiss Baltimore Storage.

The court returns the case to the magistrate judge for further action on the plaintiffs' first and fourth causes of action.

The Clerk of the Court hereby is directed to send a certified copy of this Order to all counsel of record and to Magistrate Judge Crigler.

### ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is this day

### ADJUDGED, ORDERED, AND DECREED

as follows:

418

1. The plaintiffs' objections to the Report and Recommendation, filed October 31, 2003, shall be, and they hereby are, OVERRULED, or, as appropriate, OVERRULED AS MOOT.

2. The defendants' first objection to the Report and Recommendation, filed October 24, 2003, shall be, and it hereby is, OVERRULED; the defendants' second objection to the Report and Recommendation, filed October 24, 2003, shall be, and it hereby is, SUSTAINED.

3. The magistrate judge's Report and Recommendation, filed October 14, 2003, shall be, and it hereby is, ADOPTED IN PART AND MODIFIED IN PART.

4. The defendants' motion to stay, filed June 27, 2003, shall be, and it hereby is, DENIED.

5. The defendants' motion to dismiss, filed June 27, 2003, shall be, and it hereby is, GRANTED IN PART and DENIED IN PART.

6. Defendant Baltimore Storage Co. shall be, and it hereby is, DISMISSED as a party to this action.

The Clerk of the Court hereby is directed to send a certified copy of this Order and the accompanying Memorandum Opinion to Magistrate Judge Crigler and to all counsel of record.